UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
RACHELLE R. DANIELS,                          :

                                              :        OPINION AND ORDER
                    Plaintiff,
                                              :        16 Civ. 6339 (GWG)
                    -v.-
                                              :

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,       :

                    Defendant.[1]             :
---------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

        Plaintiff Rachelle R. Daniels brought this action seeking review of the Commissioner of

Social Security's denial of her application for disability benefits.  Complaint, filed Aug. 15, 2016

(Docket # 4) ("Compl.").  Both Daniels and the Commissioner have now cross-moved for

judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c).[2]  For the reasons

stated below, Daniels' motion is denied and the Commissioner's motion is granted.

I.  BACKGROUND

        A.  Procedural History

        Daniels applied for disability insurance benefits on June 24, 2009.  SSA Administrative

---

        [1]  Nancy A. Berryhill is substituted for Carolyn W. Colvin as the defendant in this suit
pursuant to Federal Rule of Civil Procedure 25(d).

        [2]  Notice of Motion, filed Jan. 17, 2017 (Docket # 15); Plaintiff's Memorandum in
Support of Motion for Judgment on the Pleadings Under Rule 12(c) Fed R. Civ. P., filed Jan. 17,
2017 (Docket # 16) ("Pl. Mem."); Notice of Motion, filed May 17, 2017 (Docket # 23);
Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the
Pleadings, filed May 17, 2017 (Docket # 24) ("Def. Mem."); Plaintiff's Reply Memorandum in
Support Motion for Judgment on the Pleadings Under Rule 12(c) Fed. R. Civ. P., filed June 2,
2017 (Docket # 25) ("Pl. Reply").

1

Record, filed Nov. 14, 2016 (Docket # 11) ("R."), at 146-47. The Social Security

Administration denied Daniels' application on August 27, 2009. R. 86-90. Daniels then

requested a hearing before an Administrative Law Judge ("ALJ") to review this denial, R. 98-99,

and a hearing was held on June 4, 2010, during which Daniels was represented by an attorney,

R. 35-79. In a December 10, 2010, decision, the ALJ found that Daniels was not disabled.

R. 16-26. Daniels sought administrative review of the ALJ's decision on December 23, 2010,

R. 32, which was denied, R. 1-3.

On July 17, 2012, Daniels brought a federal civil action against the Commissioner of

Social Security seeking review. See Complaint, dated July 13, 2012 (Docket # 1 in Daniels v.

Astrue, 12 Civ. 5507). By stipulation of the parties, the case was remanded to the

Commissioner. See Stipulation and Order, dated June 25, 2013 (Docket # 26 in Daniels v.

Astrue, 12 Civ. 5507); Judgment, dated June 27, 2013 (Docket # 27 in Daniels v. Astrue, 12 Civ.

5507). The Commissioner then remanded the case to the ALJ who had issued the disability

determination. R. 831-35; R. 737.

The ALJ held a second hearing on December 13, 2013, during which Daniels was

represented by an attorney. R. 737-71. In a written decision dated June 3, 2014, the ALJ found

that Daniels was disabled starting on April 11, 2012, but not before that date. R. 717-30.

Daniels sought Appeals Council review of this decision on July 1, 2014. R. 881. Review was

denied on June 21, 2016, making the June 3, 2014, ALJ decision the Commissioner's final

disability determination, R. 707-13. Daniels brought this action on August 15, 2016, to review

that decision. Compl. at 1-4.

B. Daniels' Medical Record

Daniels and the Commissioner have each provided a summary of the relevant evidence

contained in the administrative record. See Pl. Mem. at 1-16; Def. Mem. at 2-25. The Court adopts the parties' summaries, which do not conflict in any material way, as accurate and complete for purposes of the issues raised in this suit. We note further that neither party objected to the other party's summary of the record, and the Court's Order of November 15, 2016, had required the parties to make any such objections. Scheduling Order, filed Nov. 15, 2016 (Docket # 12), ¶ 5.

C. The Hearing Before the ALJ

At Daniels' 2013 hearing, the ALJ confirmed with Daniels' attorney that the record was complete. R. 740. Daniels' attorney then gave an opening statement summarizing Daniels' work history, the nature of her injuries, and the status of her limitations. R. 740-43. The attorney stated that Daniels was a corrections officer for New York City who retired in October 2007 after injuring her back and right leg on March 31, 2007. R. 740-41. She then worked for a children's home where she sustained injuries to her left hand or wrist on June 28, 2008, and September 16, 2008. R. 741-42. She got another job "providing services to our military troops," where she was in a "facility" as an overseer. R. 742. In 2011, she had a partial medial meniscectomy performed on her left knee. Id.

Daniels testified that her symptoms had worsened since the last hearing before the ALJ, which was held on June 4, 2010. R. 744. Daniels had no relief from the pain in her back and knee. See R. 745. She experienced pain "[m]ost of the time," in her neck, arms, lower back, and knees. R. 748. Further, Daniels had "no use of [her] left arm most of the time," and her left hand was "numb half the time." R. 751. Daniels felt weak and had trouble sleeping because of the pain. R. 751-52. A surgery performed on Daniels' knee brought no relief, and injections only helped for "a brief moment" lasting "[m]aybe three[ or] four days." R. 745. Similarly,

3

physical therapy did not help Daniels' condition.  See id.  With the help of her attorney, Daniels

clarified that she had had "a partial medial meniscectomy to both [her] right and [her] left

knee[s]."  R. 746.

In her own estimation, Daniels could only sit comfortably "[f]or about 30 to 40 minutes,

before [she] start[ed] feeling a strain and irritability."  R. 752.  Apparently Daniels' treating

physician said that surgery could not help this discomfort.  Id.  Daniels also said that she was in

so much pain that she could barely walk, and would find herself limping, then "kneeling over"

anytime she tried to walk long distances.  See R. 752-53.  Doctors diagnosed a "nerve condition"

in Daniels' fingers, which experienced "numbness and tingling."  See R. 753.  Daniels also saw a

physician, Dr. Nasir, for headaches.  R. 757.

Daniels attended continuing, recurrent evaluative doctors' appointments every six weeks

with Drs. Cortez and Cabatu.  See R. 755-56.  Because Daniels' knee condition worsened despite

"surgeries and physical therapy, injections, all kinds of things over the years," she had to see a

new treating physician, Dr. Martin.  See R. 757.  In addition to these recurring problems, Daniels

had a hysterectomy scheduled at the time of her hearing testimony because of "really bad" pain

and discomfort from fibroids.  R. 758.  In order to manage the various causes of her pain,

Daniels took Vicodin, which resulted in dizziness and drowsiness.  See R. 763.

At the time of the hearing, Daniels was not working.  R. 748-49.  Daniels had worked on

Rikers Island as a corrections officer, see R. 749-50, but had to stop because she was injured,

R. 750.  Afterward she began a job as a counselor.  R. 750.  Daniels testified that she lived with

her ten-year-old son, who had ADHD, and that it was them "against the world," see R. 746-47,

753-54, though at least one friend and Daniels' other sons also helped her at times, see R. 747.

Additionally, a neighbor would occasionally help with grocery shopping.  R. 753.  Daniels

traveled to doctors' appointments and was capable of handling household finances.  R. 754, 756.

Daniels also testified about the conditions and requirements of her previous jobs.  R. 759-62.

Daniels is right-handed.  R. 749.  At the time of the hearing, Daniels had received her GED.  Id.

After completing examination of Daniels, the ALJ questioned a vocational expert ("VE")

about potential jobs available to Daniels in the national economy.  The ALJ presented a

hypothetical worker to the VE who had a "residual functional capacity . . . to sit for 6 hours out

of an 8-hour day, standing and walking 6 out of 8," who could "[l]ift[] and carry[] 20 pounds

occasionally, 10 pounds more frequently," with "[o]nly occasional lower extremity push/pull,"

in a job requiring "[n]o ropes, ladders or scaffolds," "[o]ccasional stairs and ramps," and "[n]o

kneeling" or "crawling."  R. 766.  Additionally, this hypothetical worker could perform

"frequent overhead distance and directional reaching."  Id.  Based on that residual function

capacity, the VE thought that Daniels could potentially perform her past work as a counselor.

R. 766-67.

The ALJ then gave a second hypothetical, with a worker who could sit "six out of eight"

hours a day; could stand and walk "two out of eight" hours a day; was limited to lifting and

carrying ten pounds; could perform "no lower extremity push/pull activities"; could not use

"ropes, ladders, scaffolds, stairs or ramps"; could occasionally balance and stoop, but could not

kneel, crouch, or crawl; had the ability to perform "frequent overhead distance and directional

reaching" as well as "frequent bilateral manual dexterity," including "gripping, handling,

dexterity and fingering."  See R. 767.  The VE testified that such a worker could not perform any

of Daniels' past work, but that there were unskilled jobs within the national economy that such a

person could perform, specifically: (1) surveillance system monitor, with 81,290 such jobs

nationally; (2) identification/security clerk, with 139,200 such jobs nationally; and (3) telephone

order clerk, with 208,800 such jobs nationally.  R. 767-68.  These jobs were not exhaustive, but merely representative of the type of work a person with such a residual functional capacity could perform.  See R. 768.  The ALJ then changed the hypothetical to require all of the same limitations, but with the additional conditions that the worker would be off task for 15 percent of the workday and would miss two days of work per month.  Id.  The VE did not believe there were any jobs nationally for such a worker.  R. 768-69.

   D.  The ALJ's Decision

   The ALJ partially granted and partially denied Daniels' application for benefits in a written decision on June 3, 2014, finding that Daniels was disabled starting on April 11, 2012, but not before that date.  R. 717-30.

   The ALJ began by noting that Daniels met "the insured status requirements of the Social Security Act" through the date of the hearing and had "not engaged in substantial gainful activity since the alleged onset date" of September 16, 2008.  R. 719.  The ALJ also found that Daniels had several "severe impairments" since September 16, 2008, including "degenerative disc disease of the lumbar spine, degenerative joint disease of the bilateral knees[,] and median entrapment neuropathy."  Id.  Further, the ALJ found an additional severe impairment that had only affected Daniels since April 11, 2012, namely "cervical radiculitis."  R. 719-20.  Even with this additional severe impairment, however, the ALJ found that no "impairment or combination of impairments [met] or medically equal[ed] the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  R. 720.  In making this finding, the ALJ considered "Listing 1.04(A) (disorders of the spine)," "Listing 1.02(A) (major dysfunction of a joint)," "Listing 11.08 (spinal cord or nerve root lesions, due to any cause)," and "Listing 11.04(B) (significant and persistent disorganization of motor function in two extremities)."  Id.

The ALJ then considered Daniels' residual functional capacity and her ability to perform work, both before and after April 11, 2012. For both periods, the ALJ noted that Daniels was unable to perform any past relevant work, was a younger individual, and had at least a high school education. R. 728. Prior to April 11, 2012, the ALJ found that Daniels had the residual functional capacity

> to perform light work . . . with ability to sit six to eight hours, stand and walk two hours out of an 8 hour workday, lift and carry 10 pounds except she cannot push or pull with the lower extremities, cannot climb ropes, ladders, scaffolds, stairs or ramps, she can occasionally balance or stoop, cannot kneel, crouch or crawl, but can perform frequent overhead distance or directional reaching and frequent bilateral manual dexterity tasks including gripping, handling, dexterity and fingering.

R. 720-26. Based on this, the ALJ considered the Medical-Vocational Guidelines in conjunction with the testimony of the VE, and found that "there were jobs that existed in significant numbers in the national economy that the claimant could have performed" prior to April 11, 2012. R. 728-29. Such jobs were "Surveillance System Monitor," "Identification/Security Clerk," and "Telephone Order Clerk." R. 729.

The ALJ's residual functional capacity determination for Daniels as of April 11, 2012, and onward was different. While the ALJ determined that Daniels could "perform sedentary work . . . except limited to occasional bilateral manual dexterity and reaching tasks," he found that Daniels "would be off task for approximately 15% of an eight-hour workday, and would miss two days of work per month." R. 726-28. Because of the additional limitations starting on April 11, 2012, the ALJ concluded that there were "no jobs that exist in significant numbers in the national economy" that Daniels could have performed, beginning on that date. R. 729-30. Thus, Daniels "was not disabled prior to April 11, 2012, but became disabled on that date and ha[d] continued to be disabled through the date of [the ALJ's] decision." R. 730.

7

II.  GOVERNING STANDARDS OF LAW

    A.  Scope of Judicial Review Under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (internal quotation marks omitted) (quoting Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012)); accord Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); accord Selian, 708 F.3d at 417; Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 447-48 (2d Cir. 2012) (per curiam).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (internal quotation marks omitted) (quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)).  Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists."  Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)); accord McIntyre v. Colvin, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational

interpretation, the Commissioner's conclusion must be upheld.") (citing Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982)).  The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard."  Brault, 683 F.3d at 447-48 (citing Dickinson v. Zurko, 527 U.S. 150, 153 (1999)).  "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise."  Id. at 448 (emphasis in original) (citations and internal quotation marks omitted).  "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision."  Johnson, 563 F. Supp. 2d at 454 (internal quotation marks omitted) (quoting Hernandez v. Barnhart, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007)).

 B. Standard Governing Evaluation of Disability Claims by the Agency

 The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found to be disabled only if it is determined that his "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  Id. § 423(d)(2)(A).

 To evaluate a claim of disability, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037

(2d Cir. 1983) (per curiam) (citations omitted); accord Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam); Craig v. Comm'r of Soc. Sec., 218 F. Supp. 3d 249, 260 (S.D.N.Y. 2016).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. See 20 C.F.R. § 404.1520(a)(4); see also Burgess, 537 F.3d at 120 (quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)) (describing the five-step process). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," id. § 404.1520(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," id. § 404.1520(c). Third, if the claimant's impairment is severe and "meets or equals" one of the listings in 20 C.F.R. part 404, subpart P, appendix 1, and "meets the duration requirement," the claimant must be found disabled. Id. § 404.1520(a)(4)(iii). Fourth, if the claimant's impairment does not meet or equal one of the listed impairments, or does not meet the duration requirement, the Commissioner must review the claimant's residual functional capacity to determine if the claimant is able to do the work he or she has done in the past, i.e., "past relevant work." Id. § 404.1520(a)(4)(iv). If the claimant is able to do such work, he or she is not disabled. Id. Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's residual functional capacity, age, education, and work experience permit the claimant to do other work. Id. § 404.1520(a)(4)(v). If the claimant cannot perform other work, he or she will be deemed disabled. Id. The claimant bears the burden of proof on all of these steps except the final one — that is, proving that there is other work the claimant can

perform.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

   C.  The "Treating Source" Rule[3]

In general, the ALJ must give "more weight to medical opinions" from a claimant's treating sources when determining if the claimant is disabled.  See 20 C.F.R. § 404.1527(c)(2); see also Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (the ALJ must give "a measure of deference to the medical opinion of a claimant's treating physician").  Treating sources "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations."  20 C.F.R. § 404.1527(c)(2).  An ALJ must accord "controlling weight" to a treating source's medical opinion as to the nature and severity of a claimant's impairments if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."  Id. § 404.1527(c)(2).  Inversely, the opinions of a treating source "need not be given controlling weight where they are contradicted by other substantial evidence in the record."  Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted); accord Selian, 708 F.3d at 418 ("The opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record.") (citations omitted).

If the ALJ does not give controlling weight to a treating physician's opinion, the ALJ must provide "good reasons" for the weight given to that opinion or face remand.  See Greek v.

---

   [3]  Regulations that came into effect on March 27, 2017, slightly alter the prior "treating physician" rule, introducing the term "treating source."  See 20 C.F.R. § 404.1527(a)(2).  The changes have no impact on this decision.

Colvin, 802 F.3d 370, 375 (2d Cir. 2015) (per curiam) (quoting Burgess, 537 F.3d at 129-30).

When assessing how much weight to give the treating source's opinion, the ALJ should consider

factors set forth in the Commissioner's regulations, which include (I) the length of the treatment

relationship and the frequency of the examination; (ii) the nature and extent of the treatment

relationship; (iii) the supportability of the opinion with relevant evidence, particularly medical

signs and laboratory findings; (iv) the consistency of the opinion with the record as a whole; (v)

whether the opinion is from a specialist; and (vi) other relevant factors.  See 20 C.F.R.

§ 404.1527(c)(2)-(6); see also Ellington v. Astrue, 641 F. Supp. 2d 322, 330-31 (S.D.N.Y. 2009)

("the ALJ should weigh the treating physician's opinion along with other evidence according to

the factors" listed in 20 C.F.R. § 404.1527(c)(2)-(6)).  The Second Circuit has stated that it will

"not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight

given to a treating physician[']s opinion and [it] will continue remanding when [it] encounter[s]

opinions from ALJ[s] that do not comprehensively set forth reasons for the weight assigned to a

treating physician's opinion."  Halloran, 362 F.3d at 33; see also Greek, 802 F.3d at 375-77.

D.  Credibility Determinations

"It is the function of the [Commissioner], not [the reviewing court], to resolve

evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."

Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) (citing Perales,

402 U.S. at 399) (additional citations omitted).  Thus, the ALJ, "after weighing objective

medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to

discredit the claimant's subjective estimation of the degree of impairment."  Tejada v. Apfel, 167

F.3d 770, 775-76 (2d Cir. 1999) (summarizing and citing with approval the decision in

Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985)).  Nonetheless, when

discounting a claimant's credibility regarding his residual functional capacity, regulations impose some burden on the ALJ to explain his decision.  As the Second Circuit has stated:

> When determining a claimant's [residual functional capacity], the ALJ is required to take the claimant's reports of pain and other limitations into account, 20 C.F.R. § 416.929; see McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980), but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record. Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).

Genier, 606 F.3d at 49; see also 20 C.F.R. § 404.1529.  To evaluate a claimant's assertion of a limitation, the ALJ must engage in a two-step process:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged.  20 C.F.R. § 404.1529(b).  That requirement stems from the fact that subjective assertions of pain alone cannot ground a finding of disability.  20 C.F.R. § 404.1529(a).  If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record.  Id.  The ALJ must consider "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings."  20 C.F.R. § 404.1512(b)(3); see also 20 C.F.R. § 404.1529(a); S.S.R. 96-7p.

Genier, 606 F.3d at 49 (alterations and emphasis in original).

The SSA has issued regulations relating to reports of pain or other symptoms affecting the ability to work by a claimant for disability benefits.  20 C.F.R. § 404.1529(c).  These regulations provide, inter alia, that the SSA "will not reject [a claimant's] statements about the intensity and persistence of [his] pain or other symptoms or about the effect [his] symptoms have on [his] ability to work solely because the available objective medical evidence does not substantiate [his] statements."  Id. § 404.1529(c)(2).  The regulations also provide that the SSA "will consider whether there are any inconsistencies in the evidence and the extent to which

there are any conflicts between [a claimant's] statements and the rest of the evidence." Id.
§ 404.1529(c)(4).

Where an ALJ rejects witness testimony as not credible, the basis for the finding
"must . . . be set forth with sufficient specificity to permit intelligible plenary review of the
record." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing
Carroll, 705 F.2d at 643); accord Craig, 218 F. Supp. 3d at 263. The ALJ must make this
determination "in light of medical findings and other evidence[] regarding the true extent of the
pain alleged by the claimant." Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984) (internal
quotation marks omitted) (quoting McLaughlin, 612 F.2d at 705). However, where an ALJ gives
specific reasons for finding the claimant not credible, the ALJ's credibility determination "is
generally entitled to deference on appeal." Selian, 708 F.3d at 420 (citing Calabrese v. Astrue,
358 F. App'x 274, 277 (2d Cir. 2009) (summary order)). Thus, "[i]f the [Commissioner's]
findings are supported by substantial evidence, the court must uphold the ALJ's decision to
discount a claimant's subjective complaints." Aponte v. Sec'y, Dep't of Health & Human
Servs., 728 F.2d 588, 591 (2d Cir. 1984) (internal citations omitted); see also 42 U.S.C. § 405(g)
("The findings of the Commissioner of Social Security as to any fact, if supported by substantial
evidence, shall be conclusive . . . .").

III.  DISCUSSION

Daniels challenges the ALJ's disability determination on four grounds: (1) the ALJ erred
in evaluating both record evidence and opinion evidence from treating physicians; (2) the ALJ
improperly evaluated Daniels' credibility; (3) the ALJ improperly evaluated Daniels' residual
functional capacity; and (4) the ALJ erred in his evaluation of the VE's testimony. Pl. Mem.
at 17, 21, 23, 25. We view the attack on the ALJ's finding as to residual functional capacity as

based on Daniels' arguments regarding the ALJ's evaluation of the record, application of the "treating physician" rule, and evaluation of Daniels' credibility. Thus, we do not address the residual functional capacity issue under a separate heading.

A. The ALJ's Evaluation of the Record and Treating Physicians' Opinions

Daniels asserts that the ALJ selectively picked "portions of [the treating physicians'] opinions, and failed to analyze relevant portions," and thus "fail[ed] to specify what portion of [each physician's] opinion he was giving 'great weight' to." See Pl. Mem. at 18. We note, however, that an ALJ is not required to address every aspect of the record in his opinion or comb the record to "reconcile every conflicting shred of medical testimony." See Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981).

Daniels makes a more specific challenge to the ALJ's purported conclusion that Daniels' "pain improved with treatment." Pl. Mem. at 18. While the ALJ's 2010 decision contains statements of this kind, R. 19, 22, the decision at issue makes no statement in this regard — and indeed obviously finds that Daniels became disabled as of April 2012. Notably, the medical record contains copious notes prior to 2012 indicating that Daniels was improving with treatment. R. 427, 433, 456, 509, 563, 566, 572, 606, 1083.

As for treating-physician opinion evidence, the ALJ gave great weight to certain conclusions of treating physician Dr. Del Savio, as well as to the conclusions of Drs. Uhorchak and Cuartas, R. 726, and some weight to the conclusions of Dr. Cabatu, R. 725-26. The Court considers these opinions in turn and finds that the ALJ did not err in his consideration of any of them.

### 1. Dr. Del Savio

The ALJ gave "great weight," R. 726, to a June 1, 2009, report of Dr. Del Savio, who, shortly after Daniels had "slammed" her left wrist in a car door, opined that Daniels could perform "light duty" work, as long as she did not use her left arm or hand, and that Daniels had a "25% temporary impairment." R. 322-23. As the ALJ noted, Dr. Del Savio "provided [a] detailed assessment" and "rendered ongoing care and described treatment and limitations with specificity." R. 726. A May 24, 2010, report from Dr. Del Savio indicated no restrictions on sitting, standing or walking in an eight-hour day, nor in bending, but indicated some restrictions on lifting. R. 973-74. The ALJ rejected Dr. Del Savio's purported conclusion that "the claimant could lift less than five pounds" on the ground it was based on "subjective complaints." R. 726. In fact, in the record referred to, Dr. Del Savio did not find that Daniels could lift less than five pounds but instead found that Daniels could lift up to 20 pounds "frequently" and up to 50 pounds "occasionally." R. 973. Thus, there is no need to determine whether the ALJ could properly give "little weight" to Dr. Del Savio's purported conclusion that Daniels had restrictions on lifting weight of less than five pounds. Notably, even accepting Daniels' subjective complaints, Dr. Del Savio opined that Daniels was not restricted in bending as of May 24, 2010. R. 974.

### 2. Dr. Uhorchak

The ALJ gave great weight to the conclusions of Dr. Uhorchak, R. 726, who, two months after Daniels' 2009 knee surgery, opined that Daniels could perform "[l]ight duty" work, with "[n]o prolonged walking," "[n]o prolonged standing," "[n]o bending or stooping," "[n]o climbing," "[n]o squatting or kneeling," and "[n]o lifting over 20lbs." R. 435-36. As the ALJ noted, even these limitations were applicable for only "four weeks" beginning in October 2009.

16

R. 726; accord R. 436.  During a later visit, in August 2011, Dr. Uhorchak listed no similar

limitations.  See R. 559-62.  Daniels points to no reason why Dr. Uhorchak's opinion was treated

improperly by the ALJ.  Daniels points to a February 2010 treatment note from Dr. Uhorchak

that Daniels should not engage in "prolonged" walking standing or sitting.  Pl. Mem. at 18

(citing R. 462-63).  But the note gave no definition of "prolonged" and specifically stated that

Daniels was otherwise able to engage in "light duty" work.  R. 463.

### 3. Dr. Cuartas

The ALJ gave "great weight," R. 726, to Dr. Cuartas's June 2010 opinion which

concluded that Daniels could sit more than six hours, stand four to six hours and walk four to six

hours in a day, and could lift up to 20 pounds "frequently."  R. 518.  While the ALJ did not

mention this aspect of the opinion in his discussion of "weight," the ALJ had previously noted

that Dr. Cuartas had found a restriction on "bending."  R. 724; see R. 519 (checking form to note

that Daniels had a restriction on "bending").  The ALJ found Dr. Cuartas's opinion to support "a

range of light work."  R. 726.

Daniels faults the ALJ with failing to give "controlling weight" to Dr. Cuartas's opinion

about bending, arguing that stooping is "a form of" bending and that a "complete inability to

stoop would significantly erode the unskilled sedentary occupational base," resulting in a finding

that Daniels was disabled.  See Pl. Mem. at 19-20.  But the ALJ's residual functional capacity

determination included a limitation that work require only "occasional[]" stooping, R. 720, and

Dr. Cuartas never opined that Daniels had a "complete" restriction on bending.  Indeed, the

evaluative evidence Daniels cites for the proposition that the ALJ erred in not finding a total

inability to bend shows limitations in motion and stiffness in Daniels' back, but nothing that

suggests a complete inability to bend or stoop.  See Pl. Mem. at 20 (citing R. 441-42, 446-47).

17

Thus, to the extent the ALJ's residual functional capacity did involve a restriction in bending, it was consistent with Dr. Cuartas's opinion.

Daniels cites three cases to support his argument on this point: Burger v. Astrue, 282 F. App'x 883, 885 (2d Cir. 2008) (summary order), Sanders v. Commissioner of Social Security, 506 F. App'x 74, 77 (2d Cir. 2012) (summary order), and Mercado v. Colvin, 2016 WL 3866587, at *15-16 (S.D.N.Y. July 13, 2016). None are apposite. The court in Burger merely held that, where a claimant's testimony was not credited because she failed to seek treatment or offer a physician's assessments of her limitations, and the claimant had testified she could not afford to seek medical care because she was uninsured, the ALJ should procure a consultative evaluation. 282 F. App'x at 884-85. There is no such contention here, however.

The court in Sanders held only that an ALJ cannot simply say that treating-source opinions "are generally consistent" when they are in fact not. See 506 F. App'x at 77 (internal quotation marks omitted). As relates to Dr. Cuartas's opinion, Daniels does not show how it was inconsistent with other medical-source opinions. In fact, Daniels says that "Dr. Cuartas['] opinion about forward bending/stooping was not 'inconsistent' with Dr. Uhorchak's opinion." Pl. Mem. at 20. We agree, as did the ALJ, who included a stooping limitation in his residual functional capacity determination. Yet, Dr. Uhorchak found only a time-limited restriction on bending in 2009, and no restriction on bending whatsoever in 2011. R. 435-36, 559-62. In Mercado, the ALJ had performed "no evaluation" of whether a treating physician's opinions were inconsistent with other substantial evidence in the record. 2016 WL 3866587, at *15. The ALJ in Daniels' case performed such an evaluation.

In any event, Daniels' argument is of significance only to the extent that restrictions on bending or stooping would render Daniels unable to perform even sedentary work. However,

one of the jobs that the VE found in significant numbers in the national economy — surveillance system monitor, R. 768 — specifically required no stooping. Dictionary of Occupational Titles, 379.367-010 Surveillance-System Monitor, 1991 WL 673244. Thus, the dispute has no practical impact.

### 4. Dr. Cabatu

Between June 2008 and December 2009, and again from March to September 2011, treating physician Dr. Cabatu routinely stated that Daniels suffered from a "[t]emporary total disability." R. 230, 232, 234, 236, 237, 239, 240, 241, 242, 243, 245, 247, 248, 251, 252, 253, 258, 259, 261, 263, 265, 267, 269, 271, 407, 408, 409, 410, 442, 449, 451, 545, 546, 549, 550, 552, 556. The ALJ discounted these opinions because Dr. Cabatu "described generally mild limitations and reported generally mild test findings." R. 726. We do not find this to be error. Dr. Cabatu never noted any specific limitations, but rather listed test findings, as noted by the ALJ. See id. Further, we note that conclusory statements as to disability may be rejected by an ALJ, who is the ultimate decision maker as to whether a claimant is disabled. Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he ultimate finding of whether a claimant is disabled and cannot work," is to be made by the ALJ and "[a] treating physician's statement that the claimant is disabled cannot itself be determinative."); accord Green-Younger, 335 F.3d at 106; Torres v. Comm'r of Soc. Sec., 2016 WL 3911980, at *8 (S.D.N.Y. July 15, 2016); Suarez v. Colvin, 102 F. Supp. 3d 552, 573-74 (S.D.N.Y. 2015); see also Killings v. Comm'r of Soc. Sec., 2016 WL 4989943, at *13 (S.D.N.Y. Sept. 16, 2016) (noting that an opinion that a plaintiff suffered from conditions that made it impossible to work was "on an issue reserved to the Commissioner"). Therefore, the ALJ was correct in giving Dr. Cabatu's conclusory disability findings minimal weight.

19

Daniels argues that the ALJ improperly "omitted references" to Dr. Cabatu's findings of "myofascial pain."[4] Indeed, Dr. Cabatu listed such pain routinely in his reports. See, e.g., R. 233, 236, 237, 238, 240, 242, 243, 246, 248, 250, 252, 253, 257, 258, 259, 261, 262, 264, 266-67, 268, 270, 408, 409, 410, 441, 448, 450. Dr. Cabatu, however, never opined that any of his diagnoses resulted in specific limitations on Daniels' ability to work. Thus, it cannot be said that the ALJ violated the "treating physician" rule. To the extent Daniels is arguing that the ALJ did not adequately consider her complaints of pain, we discuss that issue next.

B. The ALJ's Credibility Determinations

On April 11, 2012, Dr. Cuartas reported that Daniels' symptoms were "worsening" and were "severe." R. 950-52. The ALJ found, however, that Daniels' complaints about the "intensity, persistence and limiting effects" or her symptoms were "not entirely credible prior to April 11, 2012." R. 721.

Daniels' attack on this determination essentially consists of her view that there is record evidence that supports her claims of pain and there exist reasons to credit her testimony. See Pl. Mem. at 22-23 ("There was objective evidence of all of her impairments before the date that the ALJ found them disabling."). The question for a court on review, however, is not if a claimant's version of events is as equally supported by the evidence as an ALJ's decision, but rather whether there is substantial evidence to support the ALJ's conclusion. See Aponte, 728 F.2d at 591. Thus, as long as the ALJ's credibility decision was supported by substantial evidence and was sufficiently explained, an ALJ's credibility determinations are entitled to deference. See

_____

[4] Daniels claims that Dr. Uhorchak also diagnosed her with myofascial pain. See Pl. Mem. at 21; Pl. Reply at 8. However, she gives no citation to the record where Dr. Uhorchak makes such a finding and the Court has been unable to locate any diagnosis of myofascial pain other than that of Dr. Cabatu.

Selian, 708 F.3d at 420 (citing Calabrese, 358 F. App'x at 277). Daniels has not even attempted to argue that the ALJ lacked support for his credibility determination.

Although hard to follow, Daniels appears to make arguments regarding her employment in 2011 when she worked as a food service worker. R. 761-62. The ALJ found that, although this work did not constitute "substantial gainful activity," it was "consistent with greater ability than the claimant asserts." R. 725. Daniels appears to assert that the Commissioner failed in her burden to show that this work constituted substantial gainful activity. See Pl. Reply at 9 (citing Copeland v. Colvin, 771 F.3d 920, 926 (5th Cir. 2014)). This issue is a red herring, however, because the ALJ made no finding that Daniels engaged in substantial gainful activity. Rather, the ALJ found that Daniels' admitted engagement in work activity weighed on the credibility of her testimony that she could perform no work at all. R. 725. Such a finding is specifically contemplated by regulation. See 20 C.F.R. § 404.1571 ("Even if the work [a claimant has] done was not substantial gainful activity, it may show that [the claimant is] able to do more work than [she] actually did."); Robinson v. Berryhill, 2017 WL 1131967, at *6 (W.D.N.Y. Mar. 27, 2017) ("Although [claimant's] work activity did not constitute substantial gainful activity . . . this Court finds that the ALJ did not err when he found that this work activity weakened [claimant's] credibility."). Thus, the ALJ was justified in relying on work activity that impacted Daniels' credibility as to her work-related limitations.

The Court finds no other basis for rejecting the ALJ's evaluation of Daniels' credibility. Daniels attested that she cooked at least twice a week and could mop, though with difficulty, and went out "often" to the "park, grocery store[, and the] movies." R. 172-73. The ALJ also considered the fact that Daniels' treatment for this period was conservative, consisting of "physical therapy, a knee brace and a TENS unit," R. 725, which is supported by the record, see,

_e.g._, R. 427, 433-34, 544, 545, 546, 547.  Moreover, the ALJ was correct that, at least for a time, Daniels responded well to arthroscopic surgeries.  See R. 427, 434, 435, 563, 566, 590.  Most critically in this case, the ALJ had before him opinions from treating physicians stating that Daniels was capable of "light duty" work with no or minimal restrictions on sitting, standing, walking, or lifting.  See R. 323, 326, 354, 355, 518, 973.

Accordingly, there was substantial evidence to support the ALJ's credibility determination.

### C.  The ALJ's Treatment of the VE's Testimony

In what the Court views as an argument related to how the ALJ treated the record evidence — dealt with above in Section III.A — Daniels challenges the sufficiency of the ALJ's hypothetical posed to the VE in this case.  Pl. Mem. at 25-26.  In particular, Daniels claims that the "ALJ's hypothetical question [was] deficient [because] it fail[ed] to mention" all of Daniels' impairments.  See id. at 25 (citation omitted).  Daniels alleges that the hypothetical the ALJ presented to the VE should have included "references to forward bending/stooping"; the necessity that Daniels be able "to sit and stand at will"; Daniels' inability to use her left hand; as well as Daniels' inability to maintain attention, concentrate, or maintain a competitive pace.  See id. at 25-26.

Despite Daniels' claims otherwise, the ALJ's residual functional capacity determination — and the related hypothetical posed to the VE — for the time period prior to April 11, 2012, specifically referenced Daniels' ability to only "occasionally . . . stoop" and relatedly assumed that she could not kneel or crouch.  R. 720; accord R. 767.  Thus, any challenge based on the ALJ's omission of this limitation is unsupported factually and must be rejected.  Moreover — keeping in mind that we have already upheld the ALJ's residual functional capacity

determination — Daniels points to nothing in the record to support her contention that an at-will sit/stand option would be required for her condition, let alone to challenge the ALJ's evaluation of the treating sources and their opinions about sitting and standing. See generally Pl. Mem. at 26. The same is true for allegations about Daniels' purported inability to use her left hand.

Finally, Daniels has pointed to nothing in the record indicating that she had an inability to maintain attention, concentrate, or "maintain a competitive pace." See id. at 25-26. While Daniels correctly points out that she testified that the side effects of her Vicodin use included dizziness and drowsiness, Pl. Reply at 10 (citing R. 763), Daniels did not testify that such side effects affected her ability to work, and frequently denied to physicians that she experienced any dizziness, see, e.g., R. 438, 690, 1124, 1130. Moreover, in Daniels' own estimation, she did not "have problems paying attention." R. 176. We thus reject any challenge of the ALJ's hypothetical based on Daniels' inability to concentrate as unsupported by the record.

Daniels' challenge regarding the vocational testimony is thus rejected.

IV. CONCLUSION

For the foregoing reasons, Daniels' motion for judgment on the pleadings (Docket # 15) is denied and the Commissioner's motion for judgment on the pleadings (Docket # 23) is granted. The Clerk is requested to enter judgment dismissing this case.

SO ORDERED.

Dated: September 18, 2017
New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge